## MARY WILSON v. ST. LOUIS TRANSIT COMPANY, Appellant.

### In Banc, March 2, 1911.

1. **NEGLIGENCE: Looking and Seeing: Presumption.** If deceased, who was killed by a street car as. he was crossing its track, was in as favorable a position for seeing the approaching car as were two others who did see it, and he was looking in its direction, the presumption is that he both looked for it and saw it.

2. **————: ————: Car Rounding Switch: Dangerous Speed.** Laclede avenue runs east and west, and Euclid avenue north and south, and in each was a double-track railway, and at the southeast corner of the intersection there was a switch track by which cars could be turned from Euclid into Laclede. A lighted car coming north on Euclid could be seen three blocks south. The cars that ran in Euclid were called "Taylor" cars, and they ran north from Chouteau past Laclede to Delmar. The car that caused the accident was not a "Taylor" but a "Chouteau" car, not then carrying passengers, but coming from Chouteau avenue up Euclid and turning into Laclede at the curved switch for the purpose of reaching car sheds and putting up for the night. The evidence does not show that any cars took that course in the ordinary line of business. The deceased policeman started to cross over from the northeast corner of the intersection to the southeast; his course was along a line several feet east of the east track in Euclid avenue, and he had crossed over the north one of the tracks in Laclede avenue when the car, coming north on Euclid, turned east through the switch into Laclede, struck him and so injured him that he died. The other policemen present testified for plaintiff that the car was running from twenty to twenty-five miles an hour, whereas the maximum ordinance rate was eight miles; that no gong was sounded, that the car swung in on the switch at full speed without slacking, that the trolley slipped from the wire as the car entered the switch, that the lights then went out, and the name "Chouteau" on the car could have been read if the lights had not failed. *Held, first,* that, assuming that deceased saw the car, as the other policemen did, his act cannot be accounted for on any other theory than that he thought the car was a Taylor avenue car and would cross the Laclede tracks and proceed north on Euclid, and such a supposition was reasonable; and it cannot be said, as a matter of law, that a prudent man under the same circumstances would not have indulged the same supposition—and that must be the holding

in the light of the accepted rule that railroad tracks are in themselves signs of danger admonishing one about to cross them to be careful, for this switch and the use to which it was liable to be put was not such a conspicuous sign that the man who disregarded it must be condemned as guilty of negligence; *second*, deceased was not charged with the duty of knowing or anticipating the dangerous speed at which the car rounded the switch.

*Held*, by LAMM, J., in a separate concurring opinion, *first*, that plaintiff's evidence clearly showing defendant's negligence, the presumption of due care on the part of deceased must upon demurrer obtain unless the undisputed evidence clearly established the contrary; *second*, if two opinions about his negligence can be fairly entertained by fair average man, then the question of his negligence is lifted from matter of law to be decided by the court, to matter of fact to be decided by the jury; *third*, neither of the other officers testifies that he saw the electric sign "Chouteau" on the car, and it cannot therefore be presumed that deceased saw it, and knew it would at that hour of night (1:30 a. m.) turn on the switch into Laclede avenue; *fourth*, though deceased knew of the switch he cannot be charged with negligence in not knowing it was open, and it was the open switch, the reckless speed, the darkness, the instantaneous change in the direction of the car, all united, that led to his undoing; and, *fifth*, the court cannot say, as a matter of law, that he was guilty of such contributory negligence as bars his widow's suit.

*Held*, by GRAVES, J., dissenting, *first*, that the presumption that deceased was in the exercise of ordinary care vanishes upon the appearance of facts showing that he did not exercise such care; and, *second*, deceased was more familiar with the tracks and movement of the cars than the other two policemen, and what they knew he must have known; and they knew that "Chouteau" cars did not run on Euclid avenue, except to the curved switch, where they entered Laclede avenue to reach the car barn, at that time of the night; that the car could have been seen for three or four blocks, that its sign "Chouteau" could also be seen, and if he had looked he knew that it would turn on the switch; that the peculiar noise made by the trolley leaving the wire, which the others heard, while he was in a position of safety, would have been heard by him if he had given attention, and would have been actual notice that the car was entering the switch, hence he was guilty of such contributory negligence as precludes a recovery for his death.

*Held*, by WOODSON, J., dissenting, that the evidence clearly establishes that deceased saw the car approaching,

and if he had looked he would have known it would turn on the switch, and with that knowledge he indifferently went on the switch track, and was guilty of contributory negligence.

3. ———: **Permitting Jury to Say What Act is Negligent.** Ordinarily it would be error to leave it to the jury to say what rate of speed was "excessive and negligent;" but where the whole issue is whether or not the speed was in excess of the ordinance rate, the use of such words in the instruction cannot be held to require the jury to determine more than whether or not the speed was in excess of the ordinance rate.

4. ———: **Ignorance of Speed: No Evidence.** Where the time was at night and the two other policemen did not testify the rate of speed the car was running before it reached the rounding switch, but did testify it was running twenty or twenty-five miles an hour as it rounded it, and where deceased was walking ten feet ahead of them towards the switch, and the trolley left the wire and the lights went out as the car entered the switch, it cannot be held that there was no evidence to support an instruction telling the jury that if deceased saw the car coming, but by the exercise of ordinary care could not have known that it was coming at a rate of speed in excess of the ordinance limit, he had a right to presume it was not running in violation of the ordinance rate, and to proceed on his way using ordinary care to look and listen, etc. [GRAVES, J., dissenting.]

5. ———: **Statement of Motorman After Accident: Impeachment.** The statement made by the motorman soon after the accident that he had lost control of his car is not a part of the *res gestae;* but if, in his cross-examination he voluntarily states he had his car under control within a named distance, other witnesses may testify, for the purpose of impeaching him, that soon after the accident he stated he had lost control of it.

6. ———: **Respective Right to Street: No Place In Case.** Where the humanitarian doctrine is not in the case, the court does not commit error by refusing an instruction which assumes deceased was in a position of peril, and instructs the jury that if he could have gotten out of the way of the car more easily than the motorman could have stopped it, and he failed to get out, his wife cannot recover.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan,* Judge.

AFFIRMED.

*Boyle & Priest, E. T. Miller, T. E. Francis* and *G. T. Priest* for appellant.

(1) The court erred in overruling defendant's demurrer to the plaintiff's evidence. Failure to look and listen for the approach of a car upon stepping upon railway tracks is such negligence as will bar a recovery upon the part of plaintiff. When the physical facts show that if deceased had looked he would have seen the approaching car that injured him, it will be presumed that he either did not look, or, if he did look, he did not heed what he heard and saw. Boring v. Railroad, 194 Mo. 541; Schmidt v. Railroad, 191 Mo. 215; Reno v. Railroad, 180 Mo. 469; Roenfeldt v. Railroad, 180 Mo. 554; Ries v. Railroad, 179 Mo. 1; Markawitz v. Railroad, 186 Mo. 350; Hornstein v. Railroad, 195 Mo. 440; Green v. Railroad, 192 Mo. 131; Sanguinette v. Railroad, 196 Mo. 466. The demurrer to the plaintiff's evidence in this case presents but one point, was or was not deceased guilty of negligence in failing to look and listen for the approach of defendant's car before attempting to cross defendant's tracks? If it appears that he was negligent in this respect, then plaintiff is barred from a recovery. (2) The court erred in giving instruction 1 on behalf of plaintiff. Instructions should declare and define for the jury the facts that constitute negligence and leave them to find the facts. An instruction should never leave it to the jury to determine what acts constitute negligence. Hinzeman v. Railroad, 182 Mo. 624; Helm v. Railroad, 185 Mo. 222. (3) The court erred in giving instruction 6 on behalf of plaintiff, for the reason that said instruction is not law, and for the further reason, that, if it is the law, there are no facts in the evidence to support it. Reno v. Railroad, 180 Mo. 469; Green v. Railroad, 192 Mo. 131.

*A. R. Taylor* for respondent.

(1)   Appellant seems to rest serenely in the conviction, that, if the deceased did look and see the car approaching, he had to avoid it or take the blame if killed.   In other words, when deceased looked down south on Euclid avenue and saw the car coming north, he is to be conclusively held to have known: 1st, that the car was running at a rate of speed prohibited by law; 2d, that the intent of the operatives of the car was not to continue to run the car on the tracks leading north on Euclid avenue, but to abruptly turn a sharp curve, at excessive and unlawful speed, into Laclede avenue; 3d, that the switch was open, so that the car could swing into Laclede avenue without stopping to open the switch; 4th, that even if the switch was open, so that the car could round the curve into Laclede avenue, the prudent operatives of the car would run into and around the curve at a speed which defendant's expert testifies would cause the car to leave the track, with other unpleasant and disastrous consequences. If this policeman, looking at night at a car almost directly before him approaching, could, as a man of normal apprehension, determine upon the moment each of these questions of fact accurately, then appellant should have his point sustained.   If he could not know the speed at which the car was running, and was bound, in the absence of such knowledge, to believe that this law-abiding citizen, the Transit Company, would not violate the city's ordinance as to speed, then he had the right to proceed in the assurance that he was in no danger in passing over the street, because he would be safely across before a car going at lawful speed could reach or menace him.   If he looked and saw the car, as the law presumes he did, and as all the evidence indicates he did, then, acting as a prudent man, he could well do precisely as he was doing when killed.   He could not tell the speed of the car approach-

ing directly towards him. He had no reason to anticipate that defendant's servants would run the car faster than the law permitted. He was safe, in any event, if the law was obeyed. He was thus justified in his act, if he had been aware of the intention to turn the car from Euclid into Laclede avenue. For it will not answer the purpose of our civilization to hold that the population must refrain from crossing the street when a car is approaching. A car is approaching and in sight almost at all times in parts of every large city, and a conviction of negligence could be had against every judge who occupies the bench in St. Louis if it could be held negligence, as a matter of law, to cross a street in front of an approaching street car. Everyone does it, relying on an obedience by the operatives of the car to the ordinance, and everyone has to do so or in many parts of the city business would be suspended. Then, under the evidence in this case, the fact that the deceased saw the car coming north on Euclid avenue did not forbid him as a prudent, intelligent man from undertaking to cross Laclede avenue. He was guilty of no negligence, as a matter of law, in doing this, and the trial court was right in so holding and the jury were right in finding that he was guilty of no negligence as a matter of fact. Again, could the deceased, even if he by looking and listening might have ascertained that the car in question was runing at a speed greater than allowed by the ordinance, have known that the car would leave the track on which it was moving and turn up another street by way of the switch and the curve? Or could he have anticipated that the switch was thrown so that the car could run into it without stopping to open it? Or could he have anticipated that the car would run through a switch and curve at a speed which even the defendant undertakes to prove could not be done without great danger of the wheels leaving the track? All these conditions this court must find with an ac-

curacy and infallibility which declare that no person of fair mind and reasonable intelligence can dissent therefrom, for if there be room for such dissent the jury's verdict is final against appellant's contention. The rule of decision in this court from an early date, indeed, if it be not a mandate of the organic law, is that when the evidence bearing upon an issue is conflicting or disputed, or where the evidence is undisputed but admits fairly of differing inferences by fair and intelligent minds, the question of fact is for a jury, and the court should not sustain a demurrer to the evidence. The authorities to this effect are arranged in the opinion of this court delivered by Burgess, J. in the case of Powers v. Railroad, 202 Mo. 267. Says the court in that case: "But, on the other hand, if the facts bearing on the issues are disputed, or are undisputed but admit of different constructions and inferences, it must be left to the jury to decide the question of negligence." Hutchinson v. Railroad, 161 Mo. 257; Weller v. Railroad, 164 Mo. 198; Eckhard v. Railroad, 190 Mo. 611. That deceased used ordinary care to look and listen, is presumed, by the law, and if he did so look and see the approaching car, at the distance from him testified to by the eyewitnesses O'Neill and Grace, he had a right to presume that the car was not being run faster than the ordinance allowed, and to proceed to cross the street relying upon the obedience by the railroad to the law. Buesching v. Gas Light Co., 73 Mo. 233; Jennings v. Railroad, 112 Mo. 268; Hilz v. Railroad, 101 Mo. 42; Crumpley v. Railroad, 111 Mo. 152; Riska v. Railroad, 180 Mo. 191; Hutchinson v. Railroad, 161 Mo. 257; Weller v. Railroad, 164 Mo. 198; Eckhard v. Railroad, 190 Mo. 613; Powers v. Railroad, 202 Mo. 267. These authorities defeat the contention of appellant that a demurrer to the evidence should have been sustained.

VALLIANT, C. J.—Plaintiff's husband was struck and killed by a street car of defendant and this suit is brought under section 2864, Revised Statutes 1899, to recover the penalty in that statute prescribed. The acts of negligence charged in the petition are, running at high and reckless speed without keeping a vigilant watch for persons on foot moving towards or on the track, without using care to stop or control the movements of the car, without giving warning by bell or otherwise of its approach.

The petition also pleads the Vigilant Watch Ordinance and charges that it was violated, and an ordinance limiting the speed of the car to eight miles an hour and charging that in violation thereof the car was running from 15 to 20 miles an hour. The answer was a general denial and a plea of contributory negligence.

The plaintiff's evidence tended to show as follows:

The plaintiff's husband was a policeman on duty at the point of the accident, which was the intersection of Euclid and Laclede avenues in the western part of the city. These two avenues cross each other at right angles, Euclid avenue running north and south, Laclede east and west. The defendant operated at that place two lines of double-track railroad, the tracks on Euclid running north and south, and those on Laclede east and west, the four tracks crossing each other at right angles. There was also a switch by which a car coming north on the east track in Euclid avenue could be turned east into Laclede avenue. At the date of accident there was no building on either of the four corners of this street crossing. The accident occurred November 2, 1902, at the hour of 1:30 in the morning. Three policemen on duty, one of whom was the plaintiff's husband, had met at the northeast corner of this intersection. It was their duty to send in by telephone a report to the police headquarters

every hour. The box through which the report was to be sent was stationed at the southeast corner of this intersection. One of the three policemen spoke to the plaintiff's husband, Wilson, and told him it was time to send in a report, whereupon Wilson started to cross over from the northeast to the southeast corner where the police box stood; his course was along a line several feet east of the east track in Euclid, and across both tracks in Laclede avenue; he had crossed over the north and was in the south track in Laclede avenue when a car coming from the south on Euclid turned east though the switch into Laclede, struck and so injured him that he died soon after. Another one of the three policemen, O'Neill, was also crossing the street at the same time for the same purpose, following Wilson eight or ten feet in his rear. The third policeman, Grace, remained standing at the northeast corner. From where these policemen were, a lighted car coming north on Euclid avenue could be seen at a distance of three blocks south. The cars that ran in Euclid avenue were called Taylor avenue cars, they ran north and south from Chouteau avenue to Delmar, and east and west on Delmar from Euclid to Taylor. The cars on Laclede ran east and west from downtown to Forest Park. The car that caused the accident was not a Taylor, but a Chouteau avenue car, not then carrying passengers, but coming from Chouteau avenue up Euclid and turning into Laclede for the purpose of reaching the Laclede avenue car sheds and turning in for the night. Both the policemen testified that they saw this car coming north, one that he saw it just before it reached the switch, the other, when it was about 75 feet south of the intersection. They both testified that when the car turned into the switch the trolley slipped off the wire and the lights went out, also that it was running around the curve 20 or 25 miles an hour and that it turned east into Laclede through the open switch without halting or slacking

its speed, and that after striking Wilson it ran 200 or 250 feet. They heard no gong sound.

Plaintiff read in evidence the Vigilant Watch Ordinance, and also a general ordinance limiting the speed of street cars to eight miles an hour.

On the part of defendant the testimony tended to prove as follows:

The motorman testified that as he approached Laclede avenue, when within twenty yards of the switch, he sounded the gong, that seeing that the switch was open he passed in and around the curve running about ten miles an hour; he afterwards said seven or eight miles an hour, that it was an estimate only; it was drizzling rain, the track was slippery and it was down grade; that the trolley did not leave the wire and the lights did not go out; that the first he saw of Wilson he was standing in the track about five feet in front of the car, he immediately applied the brakes and reversed the power but it was too late, it was impossible to stop the car in time to avoid the accident; that the car stopped within about sixty feet after striking the man. The conductor's testimony was substantially to the same effect. An expert witness for defendant testified that a car could not pass through the switch and around the curve at the rate of 15 or 20 miles an hour without leaving the track; he thought four or five miles an hour was as fast as it could be done, on second thought he said possibly it could be done at ten miles an hour.

Defendant read in evidence an ordinance authorizing it to run cars at that place at the rate of fifteen miles an hour.

The verdict and judgment were for the plaintiff for $5000 and defendant appealed.

I. Appellant's first point is that the court erred in refusing an instruction in the nature of a demurrer to the evidence, and on that point in the brief for ap-

pellant it is said: "The demurrer to the plaintiff's evidence in this case presents but one point, was or was not deceased guilty of negligence, in failing to look and listen for the approach of defendant's car before attempting to cross defendant's tracks?"

It was undoubtedly the duty of the deceased to have looked and listened for an approaching car before he attempted to cross the track. One looking south down Euclid avenue could have seen a well lighted car several hundred feet distant. This car was seen by officers O'Neill and Grace; by one, as it came to the switch; by the other, when it was 75 feet south of the switch. If they saw it Wilson must have seen it; he was in as favorable a position to see it as they were and his face was turned in that direction. It would be unreasonable to indulge a presumption that he did not see it. We may presume therefore that Wilson saw it at least where either of the two others saw it, and so seeing it he must be charged with the duty of exercising for his own safety that degree of care that an ordinary prudent man in like circumstances would have exercised. Assuming therefore that he saw it, the question arises what did he see? He saw a car coming north on the track over which the Taylor avenue cars passed in their usual runs, crossing Laclede avenue and going on to Delmar. If he assumed that what he saw was a Taylor avenue car and he regulated his course accordingly, was that a reasonable assumption; was it such an assumption that a man of ordinary prudence would have indulged under like circumstances? Is that a question about which there can be no two opinions, is it a question of law for the court or one of fact for the jury?

Crediting the deceased with the instinct of self-preservation and assuming as we have assumed that he saw the car, we cannot account for his act on any other theory than that he thought this was a Taylor avenue car. Was he justified in so thinking? There

was a switch there by which cars could be turned from
Euclid into Laclede. If there were any cars that took
that course in the ordinary line of business the evi-
dence does not show it; whilst the evidence on the point
is meager the inference is that there were none such;
this car and the car that had preceded it were Chou-
teau avenue cars that had done their day's work and
were going to the car sheds on Laclede avenue to turn
in for the night.  This court has said in other cases
that the railroad tracks are in themselves signs of
danger admonishing one about to cross to be careful,
but was this switch and the use to which it was liable
to be put such a conspicuous sign as that the man who
disregards it must be condemned as one guilty of neg-
ligence, and is that a question to which reasonable
minds could return but one answer?  This car had the
name "Chouteau" on it, and that name could have
been read if sufficient attention had been given and if
the trolley had not slipped from the wire and left the
car in darkness. Before answering the questions above
suggested there is another fact that the plaintiff is en-
titled to have considered, that is, that this car entered
the switch without halting, at full speed (20 or 25 miles
an hour the two policemen said, 10 miles an hour the
motorman said)—swung around the curve without
slacking speed.  If the deceased was chargeable with
notice of the switch and the use to which it was liable
to be put yet assumed that it would be necessary for
a car, aimed as this one was, to stop to enable the
motorman to see that the switch was properly set or
to set it before passing in, can it be said as a matter
of law that he had no right to indulge any such pre-
sumption or should we say, that whether he was negli-
gent or not in so assuming was a question for the jury?

According to the testimony on both sides the car
came around that sharp curve at a dangerous rate of
speed, which is a fact the deceased was not charged
with the duty of knowing or anticipating.  According

to the two policemen the car was running 20 or 25 miles an hour, according to the motorman only ten, and on second thought perhaps seven or eight miles, and according to him also the track was wet and slippery and it was down grade, conditions known to the motor-man and to guard against which was his duty. According to defendant's foreman, Cushman, a car could not pass through the curve at the rate of fifteen to twenty miles an hour without leaving the rails. That was the opinion of one witness against the opinion of the two policemen that the car did in fact go through the curve at twenty to twenty-five miles an hour. Mr. Cushman thought that four miles an hour, possibly ten, was as fast as a car could have passed around the curve without jumping the track. According to Mr. Cushman, then, the motorman, if he was going faster than four miles an hour, was imprudent, and if he was going as fast as ten miles he was in the extreme limit in which it could be done with safety.

Under the circumstances of this case we hold that the question of whether or not the deceased was at the time of the accident exercising that degree of care for his own safety that a man of ordinary prudence under similar circumstances would have exercised was a question for the jury, therefore the court did not err in overruling the demurrer to the evidence.

II. In the first instruction for the plaintiff is this: "And if the jury believe from the evidence that the defendant's servants in charge of said car caused and suffered it to run around said curve from Euclid avenue into Laclede avenue at an excessive and negligent speed, and thereby caused said car to so strike and injure the plaintiff's husband," etc. Appellant assigns that instruction as error and the point asserted is that it leaves the jury to judge what act would be negligence in law. The term "excessive and negligent speed" is interpreted by appellant to mean

that it is left to the jury to say whether or not the speed that they may find the car was going was negligent in law.

The instruction could have been worded so as to express the real meaning the court intended without rendering it amenable to this criticism, but under the circumstances we do not think it was liable to be construed by the jury as the learned counsel have construed it.

There was but one standard of negligence, as to the speed, introduced in the evidence, that was the ordinance limiting the speed, the general ordinance introduced by the plaintiff which put the limit at eight miles, and the special ordinance introduced by defendant allowing fifteen miles an hour at that place.

If the car was going as fast as the plaintiff's witnesses said it was the court would have been justified in saying that the speed was negligent, because it was in excess of the limit prescribed by the ordinance which the defendant introduced in evidence, and whether or not it was going that fast was the only question of fact as to the speed in the case. In the light of defendant's expert witness defendant could not well contend that it would have been error for the court to have said that it was negligent to run through the curve even as fast as the motorman said he was running. Whilst, as was said in Hinzeman v. Railroad, 182 Mo. l. c. 624, to which we are referred, it would be error to leave it to the jury to say whether or not a certain fact was negligence, to say whether or not a certain speed was negligence, yet under the circumstances of this case we do not think any harmful error was committed in the use of the word "negligent" in the connection in which it was used in this instruction.

III. Plaintiff's instruction numbered 6 was to the effect that if the deceased saw the car coming, but by the exercise of ordinary care could not have known that

it was coming at a rate of speed in excess of the ordinance limit, he had a right to presume that it was not running in violation of the ordinance, and to proceed on his way using ordinary care to look and listen, etc. It is complained of that instruction that there was no evidence to support it.

It must be remembered that this was at night, and the car when it came in sight was coming straight towards the deceased. That fact raised the question of whether one standing or walking where the deceased was could judge of the speed of the car and on that question there is room for a difference of opinions. But it is said that the two other policemen saw and realized that the car was going at twenty or twenty-five miles an hour, and the argument is that what they saw he could have seen. These two witnesses do not undertake to say how fast the car was coming as it approached Laclede avenue, but they do say that it ran around the curve at twenty to twenty-five miles an hour. When the car turned from its straight line and swung into the curve it passed across the line of vision of these two witnesses and afforded them a better opportunity of judging its speed than when it was coming straight ahead; whether at the time it swung into the curve the deceased was in as favorable position to see as the two others were the evidence does not show; he was eight or ten feet ahead of O'Neill who was following him, while Grace still stood on the northeast corner of the streets. Besides, it was in evidence that when the car struck the curve the trolley left the wire and the lights went out. We think there was sufficient evidence on which to submit that question to the jury.

IV. When the motorman as a witness for defendant was on the stand he had testified: "In thirty or one hundred feet of the switch I had my car down." By which we understand he meant that he had his car

under control. On cross-examination he was asked if, when he went with the injured man to the office of Dr. Kuhn, where he was carried immediately after the accident and witness was there asked by a police officer how it happened, he did not say in substance that his car got away from him or that he could not control it. Defendant objected to the questions on the ground that this was not a part of the *res gestae* and that what the motorman might have then said was not binding on the defendant. The counsel for plaintiff said he asked the questions to lay the foundation for impeaching the witness, the court admitted the evidence on that ground, the witness denied making any statement of that kind. In rebuttal plaintiff introduced the police officer who testified that the motorman on that occasion told him that the car got away from him or that he could not hold it. "He answered about that way, I do not remember which of the two it was, it was something about that way." Cross-examined by defendant's attorney: "Q. Do you know which he said, whether the car got away from him or not? A. He said this—— Q. I ask you. A. I don't remember which he said. Q. You do not remember whether he said the car got away from him? A. Or that he could not hold it, that the car was slipping. Q. He said the track was slippery? A. He said the track was slippery. Q. And that he had a bad track and tried to hold the car and could not, that was about the substance of it? A. Yes, sir."

The point is made that the witness had not in his direct examination said that he had the car under control, but that what he said to that effect was on his cross-examination, and the argument is that plaintiff could not bring out new matter on cross-examination and thus lay the foundation for impeachment of the witness. The statement of the wit-

ness to the effect that he had his car down when within thirty or one hundred feet of the switch, although made during his cross-examination, was really a voluntary statement not responsive to the question. This is the form in which it came in: "Q. When you struck the switch how fast were you running? A. Ten miles an hour. Q. You ran into the switch at ten miles an hour? A. In thirty to a hundred feet of the switch, I had my car down.' And although the witness in his direct examination did not say in so many words that he had the car under control, yet taking his testimony altogether it tended to show that he did have it under control, and if in point of fact he had lost control of it, one can scarcely read his evidence without concluding that he was at least avoiding saying so, was not testifying with perfect candor and therefore was subject to impeachment by showing what he had said on the night of the accident, while the witnesses were assembled in the physician's office in the presence of the injured man. The testimony was not competent to prove that he did lose control of the car, it was not a part of the *res gestae,* and the court so ruled, but the question of whether or not the car was under control or running wild was a material one in the case, and the testimony was competent for the purpose of impeaching the witness, for which purpose alone the court allowed it. [Schloemer v. Transit Co., 204 Mo. 99.] The court did not err in admitting that evidence.

V. The court refused an instruction asked by defendant to the effect that the rights of the defendant and those of the plaintiff's husband to use the street were "equal and mutual," and that if the defendant's car moved on fixed rails, propelled by electricity, and because of its weight and momentum its movement was less easily controlled than the movements of plaintiff's husband, and if he by hastening his movement could

have gotten out of the way and he failed to do so, the plaintiff was not entitled to recover.

The learned counsel for defendant in their brief say that in their opinion the last chance doctrine (as they call it) is not in this case, but that if it is the defendant would have been entitled to that instruction on that doctrine.

The counsel are correct in saying that the last chance doctrine (which is what this court has usually called the humanitarian doctrine) is not in this case; it was expressly excluded from the consideration of the jury by another instruction given at the request of the defendant. The instructions given at the request of the plaintiff authorized a verdict in her favor only on a finding that the accident was the result of the negligence of the defendant's servant running the car and that the deceased was himself exercising ordinary care, and the instructions given for defendant directed a verdict for defendant if the jury should find that the deceased was guilty of negligence contributing to his injury. This refused instruction assumes the deceased to be in a position of peril, whether caused by his own negligence or that of the motorman, and it instructs the jury that if he could get out of the way easier than the motorman could stop the car and he failed to do so the plaintiff could not recover. There is no call for a decision as to whether that instruction would have been a correct declaration of the law if the humanitarian doctrine had been in the case, because that doctrine was not in the case, and for that reason, if for no other, the instruction was properly refused.

We find no reversible error in the record. The judgment is affirmed. *Lamm, Kennish* and *Brown, JJ.,* concur, *Lamm, J.,* in an opinion filed, in which *Kennish, J.,* concurs; *Woodson, Graves* and *Ferriss, JJ.,* dissent, *Graves, J.,* in an opinion filed, in which *Woodson* and *Ferriss, JJ.,* concur, and *Woodson, J.,*

in an opinion filed in which *Graves* and *Ferriss, JJ.,* concur.

## SEPARATE CONCURRING OPINION.

LAMM, J.—This case, pending nearly as long as the Greeks besieged Troy, has a checkered and singular history. There were two trials below. Coming here on appeal, it was submitted in Division One. That Division split in twain and the case came to Banc. Argued and submitted there, it remained either *in gremio legis* or *sub judice* for a long season, and was finally set down for another hearing and again argued in Banc. At one time or another so much has been written on it, that the writing fever, the *furor scribendi,* seems out of place. Nevertheless, as I vote for affirmance, I shall shortly give my reasons for a concurrence in the opinion of Chief Justice VALLIANT.

The record is not voluminous, but radically divergent views are taken of the probative force of the testimony. It goes without saying that on a demurrer to the evidence (which is the main and controlling contention of learned counsel for defendant), defendant's contradictory testimony fills no office at all. If the case is to break on demurrer, it is because plaintiff's testimony is wholly insufficient to carry it to the jury. That insufficiency is said to exist because decedent was guilty of contributory negligence as a matter of law. What I have to say goes to that point.

The argument advanced to support the demurrer runs on the theory that while the situation was confused, viz., it was in the dead of the night, there was a curve at which the car killing officer Wilson, suddenly darkened, at a great burst of speed took another direction through an open switch, yet that the testimony also conclusively shows that he must be held to know (as a matter of law) of the existence of the open switch and curve; that he must be held to know (also

as a matter of law) that Chouteau cars at that time of night—1:30 a. m.—ran on Euclid avenue to turn into the switch on Laclede avenue to go to the barn; that he must be held to know (also as a matter of law) of the negligent speed. On these several assumptions, it is argued that when he crossed the track on Laclede avenue at the time and place he did, he negligently assumed the obvious danger of being instantly run down and killed, such act of negligence on his part directly contributing to his death.

It is well to say at this point that we approach that argument with the implied concession that defendant ran its darkened car at a dead hour of the night at a reckless and negligent rate of speed through an open switch and around a sharp curve. There is another implied concession that must stand under this record, viz., that if the car had been running at non-negligent speed the officer would not have been done to death. We say implied *concessions,* but it would be more accurate to say that plaintiff's proofs show so much.

Those two concessions, or facts, mean that defendant's negligence is proved and that the causal connection between that negligence and the officer's death is also proved, thus reducing disputable matter to the narrow question: Can we hold, as a matter of law, that the officer was negligent; and, if so, did that negligence contribute to his own death?

I shall proceed on the assumption that if in law the officer was negligent, then it follows under the facts of this record that his negligence contributed to his injury, and plaintiff, his widow, must be cast. That assumption leaves the negligence of the officer the single and blunt question to judicially determine.

In determining that issue we must be quickened by several precepts. In the first place, so natural and strong is the love of life that a man is presumed to use due care to preserve his life, until the contrary

appears. That presumption, springing from nature, finds voice in our jurisprudence in the rule that contributory negligence is a matter of affirmative defense and the burden is upon defendant to show it. In this case, the presumption of due care in the dead man must obtain on demurrer unless the undisputed evidence shows facts successfully rebutting the presumption. In the second place, if on the evidence two opinions about the officer's negligence can be fairly entertained by fair average man, then the question of negligence is lifted over. from matter of law to be decided by the court, to matter of fact to be decided by the jury, and with which the court has not a particle of concern. It is in the light of those cardinal precepts, that I conclude the question was for the jury—because:

It was a rainy November night and sounds were somewhat deadened. Plaintiff's evidence was to the effect that the car was not heard until the time, or shortly before, it took the switch. Two brother officers were with decedent and neither of them testify that they noticed the electric sign "Chouteau" on the car before it took the switch and curve. If it be assumed that sign was present, alive and going, until the car became darkened by the trolley pole jumping the trolley wire, yet there is no evidence from which we can determine how large was the sign or how bright, or how far away it could be seen and read, a vital matter; for aside from that sign there was nothing telling an onlooker that the car was not one of those that ran usually straight north and south on Euclid avenue without turning east through the sharp curve on Laclede. To assume, as counsel seem to do in argument, that officer Wilson must be held to look and by looking be held to know the car was a Chouteau avenue car, which had no business on Euclid at that time of night except to turn east at the intersection of Euclid and Laclede, is but explaining the unknown by something more unknown—a fallacy in argumentation. It is per-

missible to argue that one should recognize a Hercules from the foot (*ex pede Herculem*), or the lion by his claw (*ex ungue leonem*), that is, the whole from a specimen or part. But in that character of argument the foot or the claw must at least be present.

Again some stress is put on the presence of gas light. There were gas posts and gas light at three corners of the intersection of Euclid and Laclede—one of them, the corner where the patrol box was, the southeast. But it is a well-known fact that gas burns dimly, then brightly at spells, and that the atmosphere has much to do with the radiation of gas street-lamps. So, in a car attracting attention to itself through a brilliant going electric light, when that light suddenly goes out the eye must readjust itself to the dim gas light in order to catch its outline, speed and direction—the latter where there are straight tracks and switches as here. On this record I am not willing to say as a matter of law that on the electric light suddenly quitting a man located where officer Wilson was should be held to judge instantly and accurately of all those things. That would put him in hard lines indeed. Especially so, in the absence of evidence as to the character of the light thrown by the gas lamps in the weather conditions. In this connection, it is also argued, that when the trolley pole jumped the wire there were spits and flashes of light because of the trolley's coming by fits and starts in contact with the live trolley wire. I have read the testimony painstakingly to see what the record discloses in that regard. One of the officers says the trolley struck the wire two or three times and emitted flashes of light. But there is no conclusive testimony, as I read it, that those flashes were at the time the car was rounding the curve, or before the car struck the officer. It is sensible to conclude that, till the car fully rounded the curve and got its direction, the loose trolley would swing clear of the wire and be more likely to come in contact with it at

spells after the car was going straight east on Laclede in line with the wire. But be that one way or the other, this record does not show that the gas light was sufficient, taken with the fitful spits of light from the trolley, to show the officer the tracks and his danger from the car in time to save himself from a car running wild.

Doubtless, officer Wilson knew of the existence of the switch and curve, but that notice was not sufficient under this record to charge him with negligence. It was the *open* switch, the reckless speed, the darkness, the instantaneous change in the direction of the car, all united, that led to his undoing. There is no testimony as I read the record that he knew this switch was open or had any call to know it was open. A Chouteau avenue car had turned in shortly before and left the switch open, but there is no testimony that this unfortunate officer knew of that fact. Doubtless, he knew that cars usually took curves and switches slowly and with caution. And in the line of his duty in undertaking to cross the east-and-west tracks, on Laclede (even if we assume that he had notice of Chouteau cars making the turn there at that time of night), yet might not a careful officer in the nighttime, acting with prudence, assume that the rate of speed would not be excessively high on such assumption? We think so. But there is another fact, and that is there is strong inferential testimony from at least one of his brother officers that Wilson was not familiar with the running arrangement of Chouteau cars at 1:30 a. m. at that point. There is a day watch and a night watch for policemen. The day watch extends from 11 a. m. until about 11 p. m., then the night watchman comes on the beat, the night watch lasting until 11 a. m. the next day. *This was the first night officer Wilson had ever been on the "night watch" at that point, so far as disclosed.* But if there was contradiction on that fact it was still for the jury.

Officer Grace, a witness for plaintiff, on cross-examination testified as follows: "Q. Where would you walk each night when you started on your beat? A. That is the first night that officer Wilson walked that beat on the *night watch*.

"Q. You mean by the night watch beginning at 11 o'clock at night and walking until 11 the next day? A. Yes, sir.

"Q. He had walked at night two or three years? A. Not there, up till half past eleven, I said."

The significance of that testimony is at once apparent when we consider that the record discloses that in the November of the accident Chouteau avenue cars along about 1:30 a. m. ran down Euclid avenue to Laclede and there turned east to the barn. That particular phenomenon occurred after midnight, that is, during the "night watch," as I see it, and this fatal night according to Grace was the first night officer Wilson was on the "night watch" at that point. In the presence of such testimony, we would not be justified in saying, as a matter of law, that the officer knew or was presumed to know that a car running straight north and south at 1:30 a. m. (apparently in use on Euclid avenue) would plunge through an open switch and catch him as he was going across Laclede tracks to the patrol box.

But it is argued that if the speed of the car was negligently excessive, yet the dead officer must be held to have notice of that speed and should have governed himself accordingly. This notice is got at by reasoning. Thus, it is said that officers Grace and O'Neill saw the great speed and testified to it, and therefore officer Wilson must have seen what they saw. True it is, those officers testified to the great speed and that they saw it. But it must be remembered they saw other things the dead officer never saw. For instance, they not only saw this car turn that curve and throw its trolley, which officer Wilson might

have seen, but after it struck Wilson they saw it run,
say from 150 to 200 feet, and this great distance, joined
with what they saw before and at the time it struck
the officer, could well furnish the *data* on which they
(not he) estimated the speed. Moreover, they were safe
and he was in deadly peril and not so well capable of
judging speed, nor were they located with reference to
this car precisely as he. They had more of a cross
view than he had.

There is a bit of evidence upon which significance
is put by counsel to the effect that officer O'Neill made
an exclamation to officer Grace—"Look, Look, Pete!"
It is argued that if Grace heard the exclamation,
Wilson heard and was forewarned. There are some
discrepancies in the record as to the position of offi-
cer O'Neill at the time he made this exclamation.
Some of the testimony puts him ten or twelve feet from
Wilson and not so far from Grace. Some of it puts
him facing Wilson and not Grace. But there is some
testimony that his face was turned at the time towards
officer Grace and not towards Wilson. Officer Grace
was asked on cross-examination this question: "Q.
Officer O'Neill was walking south when he said that?"
To that, Grace replied: "A. He kind of *turned and
spoke to me.*" Then this: "Q. When he said, Look!
Look! his back was towards you? A. No, sir." Ob-
viously, the exclamation was not directed to Wilson.
Obviously, too, if he heard it, he misunderstood it.

Considering the confused situation, the state of
the light, the time of night, the open switch, the negli-
gent speed, the darkened car (a car darkened by the
trolley jumping the wire—which jump, in turn, came
about presumptively from the negligent speed); we
say, considering those things and the further fact that
the officer was in the line of his duty at the time and
presumptively in the exercise of due care, I am unwill-
ing to say that negligence on his part was so clearly
established as to be declared as a matter of law. It

was for the jury. There the court below left it, and the jury had substantial evidence upon which to find that he was not, and that defendant was, negligent; further, that Wilson was killed thereby.

On such premises, I concur with the views of the Chief Justice and vote for affirmance. *Kennish, J.,* concurs in this concurrence.

## DISSENTING OPINION.

WOODSON, J.—I dissent from the majority opinion in this case, for the reason that no fair-minded, disinterested man, be he lawyer, judge or layman, can read this record but who must concede that the deceased saw and knew the car which struck him was approaching him; and with that knowledge he deliberately passed in front thereof, believing, doubtless, without stopping to see, that it would continue north on Euclid avenue, and that he could pass on south in perfect safety. The car, however, instead of continuing north turned east, and intercepted him as he passed over Laclede avenue. He also knew that some of those cars continued north and south and some of them turned east; and with that knowledge, when he saw the car approaching, it was his plain duty to have ascertained which track the car was going to take, and have avoided coming in contact with it. Especially was that true when he saw and knew the rapidity with which it was approaching. Nor was there anything in the situation which could have deceived him or warped his judgment, and thereby have caused him to place himself in a place of danger.

He was not fooled by the speed of the car, but by the direction it took. He simply guessed that it would go one way, when, in fact, it went the other. He knew, as before stated, that it was liable to go either way; but the evidence fails to show that he made any effort whatever to ascertain which. Unfortu-

nately for himself and his family he risked his life upon a guess, and lost. He had no right to do that; but by doing so, he, and not the defendant, assumed the risk and caused the injury.

Clearly, in my opinion, the deceased's own negligence caused his death, and for that reason, in my judgment, his widow has no right to a recovery.

So viewing the case, I think the judgment of the circuit court should be reversed.

*Graves* and *Ferriss, JJ.,* concur.

## DISSENTING OPINION.

GRAVES, J.—I do not concur in the majority opinion in this case for a number of reasons. First, I think the facts are too scantily stated, and I shall therefore restate the case.

Plaintiff's husband was a police officer in the city of St. Louis. He was struck and killed by one of defendant's street cars, and this is an action to recover the penalty prescribed by section 2864, Revised Statutes 1899. Upon a trial before a jury plaintiff obtained a verdict for the penalty of $5000, and from a judgment rendered thereon the defendant appealed to this court.

The collision which resulted in the death of Henry M. Wilson, husband of plaintiff, occurred about 1:30 a. m., November 2, 1902. The negligence counted upon in the petition is thus stated in three separate paragraphs:

"And the plaintiff avers that at the time her husband was so struck and injured, defendant's servants were running said car at a high and reckless speed around said curve, without using any care to keep a vigilant watch for persons on foot, moving towards and on said track, and in danger of being struck and injured by said car, and without using any care to stop or control the movement of said car, and to avert

injury to plaintiff's husband, and without giving any warning by bell or otherwise of the approach of said car to said crossing, which acts of negligence and each of them directly contributed to cause the injury and death of the plaintiff's husband.

"And for another and further assignment of negligence, the plaintiff avers that at the time of injury of her husband, there was in force an ordinance of the city of St. Louis whereby it was provided that motormen and conductors of street cars should keep a vigilant watch for persons on foot, either on the track or moving towards it, and on the first appearance of danger to such person the car should be stopped within the shortest time and space possible, yet the plaintiff avers that at the time of the injury to her husband the defendant's motorman and conductor in charge of said car, failed to keep such vigilant watch and failed to stop said car within the shortest time and space possible upon the first appearance of danger to plaintiff's husband, which violation of said ordinance directly contributed to cause the injury and death of plaintiff's husband.

"And for another assignment of negligence the plaintiff avers that by said ordinance it was provided that street cars should not run within the city of St. Louis at a greater speed than eight miles per hour. Yet the plaintiff avers that at the time of the injury to her husband, defendant's motorman and conductor in charge of said car were running said car in excess of a speed of eight miles per hour, to-wit, about fifteen to twenty miles an hour, in violation of said ordinance of the city of St. Louis, which violation of said ordinance directly contributed to cause the injury and death of the plaintiff's husband. Said ordinance being section 1760 of the Revised Ordinances of the city of St. Louis, subdivisions 4 and 10, that by the death of her husband, as aforesaid, an action has accrued to the plaintiff to sue for and recover the sum of five thou-

sand dollars, according to the statute in such cases, for which sum she prays judgment.''

Defendant answered by way of (1) a general denial, and (2) a plea of contributory negligence. Reply was a general denial. Such were the issues made by the pleadings.

The issues were reduced by the instructions for plaintiff to the negligence counted upon in the first paragraph quoted from the petition supra. Upon this question the first instruction, so far as pertinent, reads:

''And if the jury find from the evidence that defendant's servants in charge of said car caused and suffered it to run around said curve from Euclid into Laclede avenue at an excessive and negligent speed and thereby caused said car to so strike and injure the plaintiff's husband;

''And if the jury find from the evidence that defendant's said servants did not exercise ordinary care in so running said car at such excessive and negligent speed around said curve, if you find from the evidence it was so run, and thereby directly caused said car to strike and injure the plaintiff's said husband;

''And if the jury believe from the evidence that plaintiff's husband exercised ordinary care to look and listen for a car and to avoid injury therefrom at the time of his injury, then plaintiff is entitled to recover.''

Upon the question of contributory negligence the plaintiff asked, and the court gave, instruction number 6, which reads:

''The court instructs the jury that if they believe from the evidence that the deceased saw the car mentioned in the evidence when he started to cross the track on which he was struck and did not know, nor, by the exercise of ordinary care in looking and listening for a car, would not have known that the car was running at a speed in excess of the ordinance provis-

ion read in evidence by defendant, then the deceased had a right to rely on said car not being run at a speed in excess of that allowed by the said ordinance and to proceed to cross the track using ordinary care to look and listen and to avoid danger from the car whilst so doing.''

Other matters as to instructions to the jury will be considered with the points made. Defendant interposed a demurrer to the evidence, and this calls for a full statement of the facts and surroundings.

## THE FACTS.

The accident occurred at the intersection of Euclid and Laclede avenues in the city of St. Louis. Euclid avenue runs north and south, and Laclede avenue east and west. The corners of this intersection on the east side of Euclid avenue were unoccupied, except on the northeast corner was a tree setting back fifty feet.

The defendant operated a double-track street railway upon both of these avenues, and the tracks of course intersected at the intersection of the avenues. There was a switch on the south side of Laclede avenue which permitted cars to pass from the Euclid avenue tracks to the Laclede avenue tracks and *vice versa*. This switch is described as a short right angle curve. The car which struck deceased was a Chouteau avenue car and at the time was turning into Laclede avenue to go east to the defendant's car barn for the night. Another such car had gone before this one for the same purpose, and had left the switch open. Chouteau avenue is some ten blocks south of Laclede avenue, and to get to the car barns these two cars had come north on Euclid and turned east through this curved switch. Officer Wilson had been stationed in this neighborhood for many months prior to the accident and must have been familiar with the movement of these Chouteau

avenue cars as they were turned in for the night through the curved switch aforesaid. Under plaintiff's evidence a lighted car coming north on Euclid avenue could have been seen three or four blocks south of Laclede avenue. Over the ends of the car in question was a lighted sign "Chouteau," which could have been seen, but for what distance does not appear in evidence.

Just prior to the accident deceased Wilson and two fellow officers, O'Neill and Grace, were standing upon the sidewalk at the northeast corner of this street intersection. On the southeast corner of Euclid avenue was a patrol box where these officers went each hour to report to headquarters. Their report was due on this occasion at 1:30 a. m. At 1:25 a. m. it was suggested that it was time to report, and officer Wilson started across from the northeast toward the southeast corner to this patrol box. Eight or ten feet behind him followed officer O'Neill, but officer Grace remained on the sidewalk at the northeast corner. Upon the testimony of officers O'Neill and Grace depends plaintiff's case. The material portions of O'Neill's testimony are:

"Q. Go ahead. A. We started to go across the street to call up, officer Grace was on the north side of the street talking to us; I could not recollect what officer Grace said to me, I stopped to speak to him; as I turned around the car was coming north on Euclid avenue and I said, 'Look, look, Pete!' just like that.

"Q. Who was Pete? A. Pete Grace, officer Grace.

"Q. What did you see the car doing? A. Coming around the curve at a high rate of speed. . . .

"Q. You see cars running every day? A. Yes, sir.

"Q. In your opinion, how fast was the car running? A. The way it came around the curve I judge

it was running twenty or twenty-five miles an hour, I can't swear that.

"Q. That is your opinion? A. My opinion, that is all.

"Q. When the car ran around the curve, from what street did it turn? A. It turned from Euclid in on Laclede.

"Q. As the car ran around and struck him was there any slackening of the speed before it struck him? A. No, sir.

"Q. How far across the track was he when he was struck? A. He was almost in the track, it caught him on the right side, just as he was going across the track.

"Q. What, if anything, did you observe of the trolley at the time, was it off or on? A. When it hit the curve the trolley went off.

"Q. When the car hit the curve the trolley flew off? A. Yes, sir.

"Q. What was the effect on the lights in the car when the trolley went off? A. When I went over to officer Wilson, when he was lying in the street, the car was dark, *but it was striking the wires and lighting up every once in a while.*

"Q. After the car struck Mr. Wilson, how far, in your opinion, did it run? A. Well, I couldn't say, I judge it ran two hundred or two hundred and fifty feet, it surely went that distance, two hundred or two hundred and fifty feet.

"Q. Where did you find Mr. Wilson after he was struck? A. About a foot or two of the curbstone, about ten feet east of the crossing, maybe twelve feet.

"Q. Ten or twelve feet east of the crossing? A. Ten or twelve feet east of the crossing, and about eighteen inches or two feet of the curbstone. . . .

"Q. Standing where either you or officer Wilson stood and looking south, how far could you have

seen a lighted car coming? A. About Audubon avenue.

"Q. How far south is that from Laclede? A. Three or four blocks, I could see it that far.

"Q. Either where you stood or Wilson stood? A. Yes, sir.

"Q. You saw the car coming north there that night? A. I saw it when it came to the curve.

"Q. And you heard it also? A. Yes, sir.

"Q. Now, the car made noise enough to attract your attention, and you were further from it than Wilson? A. Yes, sir.

"Q. Officer Grace heard it? A. I don't know.

. . . .

"Q. This car running, as you say, at the rate of twenty miles an hour, struck him and only knocked him six or eight feet. You say the trolley went off when the car struck the curve? A. Yes, sir.

"Q. What effect did that have with reference to noise, don't it make an unusual noise as it strikes the wire? A. Yes, sir.

"Q. You heard it that night? A. Yes, sir.

"Q. Did it not make an unusual condition, *as it left the wire it would be dark, and light as it struck the wire?* A. *Yes, sir.*

"Q. *It flashed every time it struck the wire?* A. *Yes, sir.*

"Q. *That would flash the lights on the car?* A. *Yes, sir.* . . .

"Q. Who were you hollowing to when you said, 'Look, look'? A. Officer Grace.

"Q. He was not in any danger, he was not near the car track, he was not in the street, Wilson was right in the track? A. I couldn't tell.

"Q. When you hollowed, 'Look, look,' you hollowed because you saw the car about to strike Wilson? A. No, when I hollowed 'Look, look,' I was after speaking to officer Grace.

Wilson v. St. Louis Transit Co.

"Q. What was the occasion for you to say 'Look, look'? A. When I saw the car coming with such power over the street.

"Q. When you saw and heard it coming? A. Yes, sir.

"Q. *You saw and heard it both?* A. *Yes, sir.*

"Q. Your exclamation, 'Look, look,' was before Wilson was struck? A. Yes, sir.

"Q. You say you were calling to Grace, not to Wilson? A. Yes, sir.

"Q. Why didn't you hollow to Wilson? A. I was hollowing to the man I was speaking to.

"Q. Was your back turned? A. Not at the time.

"Q. You were looking in the direction of Wilson? A. What did you say?

"Q. You were looking in the direction of officer Wilson? A. I started to follow officer Wilson.

"Q. When you said, 'Look, look,' you were looking towards officer Wilson? A. Yes, sir.

"Q. Your back was to officer Grace? A. Yes, sir.

"Q. Officer Wilson was the man in danger? A. Yes, sir.

"Q. Officer Grace was not in the street, he was upon the sidewalk? A. He was in no danger.

"Q. You were how far away from officer Wilson when you hollowed, 'Look, look'? A. I made the statement two or three times I thought it was eight or ten feet.

"Q. When you gave the alarm? A. I think that was the statement.

"Q. As you hollowed, 'Look, look,' you were eight or ten feet from officer Wilson? A. Yes, sir."

The other man, officer Grace, upon the point in issue testified:

"Q. What did you see Mr. Wilson do before he was struck? A. He was crossing over the tracks to the patrol box to call up.

"Q. How far did he get across the tracks before he was struck? A. *The last I saw him he was between the north and south tracks, when O'Neill called my attention to the car, said, 'Look, look, Pete'!*

"Q. Between the tracks or between the rails of the south track? A. Between the tracks, the south rail of the track.

"Q. Had you observed the car coming north on Euclid, had you looked at it and seen it? A. Not until O'Neill called my attention to it.

"Q. When he called your attention to it where was the car? A. *A little bit south of Laclede avenue, maybe seventy-five feet or so.* . . .

"Q. When the car struck the switch and ran into the curve, what effect, if any, did it have on the trolley? A. The trolley jumped off the wire when it struck the switch.

"Q. How was the car when the trolley left the wire as to the light or darkness? A. It was in darkness, it would hit the wire, in and out again. . . .

"Q. You were standing on the sidewalk on the northeast corner, were you? A. Yes, sir.

"Q. Officer O'Neill was about six or eight feet south of you? A. *He was southeast of me.*

"Q. *Officer Wilson, who was struck by the car, was ten or twelve feet further south of O'Neill?* A. Yes, sir.

"Q. *So after officer O'Neill was almost directly between you and officer Wilson?* A. *Yes, sir.*

"Q. Officer Wilson was going south to walk across the two street car tracks? A. Yes, sir. . . .

"Q. Wilson got into the south track, he crossed the north track before the accident? A. *When I saw him he was between the north and south tracks.*

"Q. He had crossed the north track and was struck on the south track? A. Yes, sir.

"Q. Was he struck right at the corner of Euclid and Laclede? A. *He was a little east of the crossing.*

Wilson v. St. Louis Transit Co.

"Q. How far. A. About two or three feet east.

"Q. When you first saw it it was one hundred feet·south of Laclede? A. About that.

"Q. You were sixteen feet further north than officer Wilson? A. About that.

"Q. He was that much nearer to the car than you? A. Yes, sir.

"Q. You saw the car coming down Euclid Avenue one hundred feet away? A. I did when my attention was called to it.

"Q. It was lighted? A. Yes, sir.

"Q. It was lighted all the time until it struck the curve? A. Yes, sir.

"Q. When the car struck the curve, the trolley went off? A. The car was in darkness.

"Q. I didn't ask you that? The trolley went· off? A. Yes, sir.

"Q. When the trolley goes off what happens with reference to noise? A. It doesn't make as much noise.

"Q. *Does it make a peculiar noise? A. A peculiar noise.*

"Q. It makes a noise every time the trolley strikes the wire. A. Yes, sir.

"Q. That noise you do not hear when it is on? A. No, sir.

"Q. *There was that much more to attract attention that night than usual, the trolley striking the wires? A. It hit a couple of times.*

"Q. What effect does it have on the darkness or light of a car when it strikes the wire? A. It gives out a little flash of light.

"Q. *It gives out in the car? A. Yes, sir.*

"Q. *There is a change from darkness to light? A. Yes, sir.*

"Q. *There was that which was unusual to attract attention at that time? A. Yes, sir.*

"Q. Where was Wilson when the car hit the curve? A. The last time I saw him he was between the north and south-bound tracks.

"Q. How far was the lighted car away from Wilson when he was between the north and south-bound tracks? A. When I saw it it was seventy-five or one hundred feet.

"Q. Seventy-five or one hundred feet south on Euclid? A. Yes, sir.

"Where was the car when you heard officer O'Neill hollow, 'Look, look'? A. That is where it was.

"Q. *You heard the call before Wilson had gone on the south track?* A. *Yes, sir.*

"Q. *You heard officer O'Neill say, 'Look, look'! before he went on the south track?* A. *Yes, sir.*

"Q. *When the car was seventy-five or one hundred feet south on Euclid?* A. *Yes, sir.*

"Q. Did you see what Wilson did? A. No, sir.

"Q. Officer O'Neill was walking south when he said that? A. He kind of turned and spoke to me."

The evidence further shows that this switch leaves Euclid Avenue at a point twelve feet south of Laclede Avenue. The evidence does not disclose the width of these streets, except that Euclid Avenue was about as wide as the usual street. It was stated in argument, and undenied, that the streets were sixty feet in width. The evidence also shows that there were gas lights on three of the four corners of this intersection. For the plaintiff the evidence shows that the car ran into the curve at a rate of 20 to 25 miles per hour. For the defendant it was shown to have gone into the curve at from 7 to 10 miles per hour, and that had it turned the short curve at a rate faster than ten miles per hour the car would have left the tracks. It was also made to appear that the tracks were slippery, and that the light on the car was stationary, so that in turning a car on the curve the light would not shine fully upon

the curved track, but straight ahead of the end of the car. It appears that both Taylor and Chouteau Avenue cars ran upon the Euclid Avenue tracks. Upon this point an interesting bit of testimony is given by officer O'Neill thus:

"Q. Did you know where the Taylor Avenue cars ran? A. I know they ran north and south on Euclid Avenue.

"Q. Did they turn east on Laclede? A. No, sir.

"Q. They ran north and south all the way? A. Yes, sir.

"Q. Ran as far as Delmar north? A. Yes, sir.

"Q. Where did they come on Euclid south? A. I don't know.

"Q. They passed that corner and did not turn east? A. No, sir.

"Q. *Where did the Chouteau Avenue cars run?* A. *The Chouteau Avenue cars were turning in at the Laclede avenue shed.*

"Q. Where did they take Laclede Avenue? A. At Laclede and Euclid."

Other matters of evidence and instructions may be noted later, if shown material. This fairly states the case.

## OPINION.

To my mind the trial court erred in not directing a verdict for the defendant, as it was requested to do. We must not lose sight of the surroundings, both physical and otherwise. Deceased for a long time had been familiar with the movement of defendant's cars at this point. The two officers who testified for the plaintiff had not seen service at the point of the accident as long as had deceased. Things with which they were familiar, deceased must have been familiar with. If so, then what did deceased know? He knew that Taylor Avenue cars were not deflected at Laclede Ave-

nue, but ran straight north and south on Euclid Avenue. He knew that Chouteau Avenue cars did not run on north, but were deflected to Laclede Avenue at certain hours of the night, to be housed at the car barns on that street. He knew that a coming car could be seen at least three blocks off, and not only that, but he knew that the lighted sign "Chouteau" or "Taylor" could be seen. If he saw the sign "Chouteau," he knew that the car bearing it would not go·north, but would be run in over this curved switch to be placed in the car barn. When he saw that sign he knew it was a car being retired for the night, because such cars did not run on Euclid Avenue, save for this purpose. His fellow officers knew these facts, and what they know he must have known. [Higgins v. Railroad, 197 Mo. l. c. 317.]

Going a step further, it appears that these two fellow officers knew that when a trolley left the wire a peculiar and unusual noise was made. This deceased must have known. They say that this occurred upon this occasion, and further that it occurred whilst deceased was in the space between the two railway tracks—a place of safety. Attention upon the part of deceased would have given him full knowledge, and this too, while yet in a place of safety. Grant it that the car was first dark and then light by reason of the trolley leaving and then retouching the wire, yet there were these street lights by which a car could have been seen. We can not presume that the deceased was in the exercise of ordinary care in the face of the facts detailed in evidence. In the Higgins Case, supra, upon the question of presumptions, we said:

"Presumptions, however, vanish upon the appearance of testimony and upon the appearance of facts and circumstances which would show that the presumptions ought not to be indulged. The basic presumption in this case is that deceased exercised due care for his own safety before attempting to cross the track, by

looking and listening. Should this presumption be indulged in the light of the testimony? In other words, had he looked, could he not have seen the car as did the witnesses? Had he listened, couldn't he have heard the coming car? There are no circumstances showing any obstructions to the view save and except the darkness of a November evening at 6:20 p. m., described in plaintiff's petition as 'nightfall fast settling down upon the highways.' There is nothing in the evidence tending to show any obstacle as to his hearing the approaching car, save and except the movement of his own wagon. The evidence shows a light at Fifteenth Street and one at Sixteenth Street, the one about 300 feet and the other about 130 feet from the place of accident. It is true that the character of these lights is not shown by the record, a thing which ought to have been shown, not only for the enlightenment of the jury, but for the enlightenment of this court. Under these facts we are inclined to the view that the contributory negligence of the deceased is sufficient to defeat this action. The demurrer to the evidence should have been sustained.''

So in the case at bar, there is direct testimony, as well as a multitude of circumstances, showing the negligence of deceased. To have looked would have been to have seen this approaching car before it reached the switch, which switch was but twelve feet south of Laclede Avenue. To have looked would have been to have seen the lighted sign ''Chouteau,'' which would have indicated that the car was one coming in on this switch. To have listened, as did his fellow-officers, would have been to have heard the peculiar sound made by the jumping trolley pole.

Not only so, but had he looked he could have seen and known the speed of the car, as did his fellow-officers. It will not do to say that he was in a worse position to see it. The corners of this intersection were vacant. Deceased, it is true, was a few feet ahead of

O'Neill, but as to a car coming up Euclid Avenue, he, by reason of this fact, would be a little more to the side of the car than would be O'Neill. If you take the pains to make a diagram of the situation as disclosed by this evidence, it will be perfectly apparent that this is true. In drawing such diagram you must remember that the evidence discloses that these three men were practically in a straight line, with deceased on the south end of the line, O'Neill eight or ten feet to the north of deceased, and Grace in the same line, but stationary on the sidewalk. You must also remember that under this evidence the line mentioned was slightly to the east side of Euclid Avenue. So that when a diagram of this situation is drawn, it will be perfectly clear that Wilson was in a better position to determine the speed of the approaching car than were the two officers testifying. He had as much or more experience, and if they knew the speed, he knew the speed. If they heard the peculiar sound, he heard it, or in the exercise of ordinary care he could have heard it. If they saw the excessive speed, he, if in the exercise of ordinary care, likewise saw it.

It is not to be presumed that he intentionally walked into a death trap, but it is clear that he negligently so walked. Had deceased given attention to the things surrounding him, he would have heard the exclamation of officer O'Neill, and this was when he was in a place of safety. Officer Grace heard it, and was in no better position to hear than was deceased.

It will not do to say that deceased relied upon it being a car going north on Euclid Avenue. He knew that at that time of night cars would be going in both directions. He knew that he could tell the direction by a single glance at the illuminated sign thereon. Before going upon the fatal tracks it was his duty to have looked and listened. The evidence and facts and circumstances for the plaintiff clearly show that he did

neither. The case is one of fact rather than of law. The law of such a case is well settled.

Granting all the negligence charged to the defendant, yet the concurring contributory negligence of deceased bars plaintiff's action. The case does not invoke the humanitarian rule.

To my mind this is the clearest case of contributory negligence to be found in the books. That the exact facts of the case might appear I have quoted more of the evidence than should have been done, but my firm conviction of the injustice of this judgment is the excuse therefor. To my judgment there is error in one or two of plaintiff's instructions, but with the views we entertain there is no need for a discussion of these matters.

The judgment should be reversed. *Woodson,* and *Ferriss, JJ.,* concur in these views, *Woodson, J.,* in a separate opinion filed, in which *Graves* and *Ferriss, JJ.,* concur.